IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

UNITED STATES OF AMERICA

v.                                                   CRIMINAL NO. 2:17-cr-31-KS-JCG

ALBERT DIAZ, M.D.


**UNITED STATES' MEMORANDUM IN SUPPORT OF ITS MOTION
IN *LIMINE* FOR AN ORDER PERMITTING THE UNITED STATES
TO OFFER AS EVIDENCE IN ITS CASE-IN-CHIEF STATEMENTS MADE BY THE
DEFENDANT DURING PROFFER PROTECTED INTERVIEWS**

The United States, through undersigned counsel, hereby moves this Court for an Order

permitting the government to introduce, in its case-in-chief, statements made by Albert Diaz, M.D.,

("the Defendant") to the government during interviews subject to a proffer agreement.  As the

Defendant made material misstatements to the government during his proffer protected interviews,

and failed to provide complete and truthful information, the Defendant breached the provisions of

his proffer agreement with the government.  Therefore, statements made by the Defendant therein

may be offered by the government as evidence against him.

## BACKGROUND

### I.      Overview of the Charges and Investigation

On October 18, 2017, a federal grand jury empaneled in the Southern District of

Mississippi charged the Defendant in a sixteen-count indictment with an assortment of felony

violations, including conspiracy to commit health care fraud and wire fraud (Count 1), conspiracy

to distribute and dispense a Schedule III controlled substance—ketamine—(Count 6), and

conspiracy to falsify records in a federal investigation (Count 11) ("Indictment") [ECF No. 1].  As

is alleged in the Indictment, and further detailed in the United States' motion *in limine* to exclude

an improper defense argument [ECF Nos. 27, 28], the charges stem from the Defendant being presented with and signing prefilled prescription forms authorizing prescriptions for compounded medications, some of which contained ketamine, to beneficiaries whom the Defendant never saw, as well as the Defendant's efforts to conceal his fraudulent conduct. *See, e.g.*, ECF No. 1, at ¶ 20.

Specifically, beginning in or around October 2014, and continuing through in or around December 2016, Gerald Schaar ("Schaar"),[1] a marketer for Advantage Pharmacy ("Advantage"),[2] located in Hattiesburg, Mississippi, provided the Defendant with preprinted prescriptions forms created by Advantage that included prescriptions for pain cream, scar cream, and wellness capsules, as well as allowed for multiple refills of these products. *Id*. The preprinted prescription forms contained the personal identifying information ("PII") for TRICARE beneficiaries, which Schaar obtained from Marketer 2. The Defendant then authorized these prescriptions by signing them even though he had not seen any of the beneficiaries to determine medical necessity. *Id*. Schaar then faxed those forms to Advantage, which filled and dispensed the compounded medications authorized by the Defendant, and then billed TRICARE for these prescriptions. *Id*.

In December 2015, TRICARE's pharmacy benefit manager notified the Defendant that it was conducting an audit of the compounded medications that he had authorized and that were billed through Advantage. *See* ECF No. 1, at ¶ 30. After receiving notification of this audit, the Defendant contacted Schaar about meeting with the beneficiaries for whom the Defendant had authorized the compounded medications. *Id*. In January 2016, the Defendant, with the assistance of Schaar and Marketer 2, met with the beneficiaries so that the Defendant could create false patients records to make it appear as though the Defendant had personally examined these

---

[1] Identified in the Indictment as "Marketer 1." *See* ECF No. 1, at ¶ 15.

[2] Identified in the Indictment as "Pharmacy 1." *See* ECF No. 1, at ¶ 13.

beneficiaries before prescribing the compounded medications at issue. *Id.* The Defendant also completed TRICARE audit response forms that falsely indicated that he had personally examined the beneficiaries for whom he had authorized the compounded prescriptions that were filled by Advantage. *Id.* The Defendant sent these false audit response forms and falsified patient records to TRICARE in response to the audit, and subsequently provided these false records to the Department of Justice after receiving a subpoena for records. *Id.*

## II.     Investigative Background

During the government's investigation of the aforementioned events, Schaar agreed to cooperate with the government, including in its investigation of the Defendant.

### A.     September 16, 2016

In an effort to cooperate with the government, Schaar met with the Defendant on September 16, 2016 at the Defendant's office, and further agreed to record the conversation ("September 16 Meeting"). During the recorded September 16 Meeting, Schaar engaged in conversation with the Defendant regarding Marketer 2. Specifically, the discussion went as follows:

SCHAAR: I suspect they're gonna ask about [Marketer 2][3].

DIAZ: I don't know [Marketer 2].

SCHAAR: Well I know you don't know [Marketer 2]. [Marketer 2] sent me the stuff for you to put in the charts.

Ex. 1, at 6.

***

DIAZ: They know [Marketer 2]. I don't know [Marketer 2]. I've never met [Marketer 2], never talked to [Marketer 2].

SCHAAR: Well, [Marketer 2 is] the [individual] that brought us around.

---

[3] Where "[Marketer 2]" is inserted, Marketer 2's first name was actually used.

DIAZ: Well, believe it or not, I didn't know that, til. I didn't remember until you just told me.

*See* Ex. 1, at 6-7.

During this conversation, to the extent that the Defendant did not remember Marketer 2's name, Schaar reminded the Defendant of it.

**B.      January 31, 2017**

In January 2017, federal investigators contacted the Defendant, through his counsel, and requested an interview with the Defendant to discuss the compounded medication prescriptions. The Defendant, again through his counsel, agreed to meet with the government.  In anticipation of the Defendant's meeting with the government, the Defendant and Schaar agreed to meet, in person, and ultimately met on January 31, 2017 at the Defendant's office ("January 31 Meeting").  Schaar, as he was cooperating with the government, agreed to record the meeting.

During the January 31 Meeting, the Defendant and Schaar discussed how Schaar received the names of beneficiaries from Marketer 2, the Defendant's interactions with Marketer 2, and the fact that the Defendant had written prescriptions for these beneficiaries without first seeing them (which the Defendant acknowledged was "illegal").  As set forth more fully below, the Defendant specifically advised Schaar not to mention the name of Marketer 2 to the government because the Defendant was concerned if the government found out he received the beneficiary names from Marketer 2 (who is directly associated with Advantage), it would "impl[y] [the Defendant was] giving a prescription without seeing them," which, of course, he was.  Ex. 2, at 11.  Specifically, the audio recording provides:

DIAZ:  I'm not, I'm not gonna say you took me up there.  I'm not gonna say that you filled out the forms.

SCHAAR:  The prescriptions?

4

DIAZ:  Yeah.

SCHAAR:  Ummkay.

DIAZ:  Umm.  If they're coming after me, they're gonna be looking into who's the middle people, so that means you.

SCHAAR:  Mhm.

DIAZ:  So I wanted to let you know what the hell I'm going through right now.

SCHAAR:  Mkay.

*Id*, at 2-3.

        ***

DIAZ:  So, I'm probably gonna say that the name was given to me possibly by the representative.

SCHAAR:  I don't want you to lie.

DIAZ:  Well that's how I got the names.

SCHAAR:  Yeah.  I wouldn't say possibly, ya know?  I mean no, no.  I mean you-you talk.

DIAZ: But, uh, so why did [Marketer 2][4] give them to you?  Because people needed the medication and they weren't getting it at the VA, is that correct?

SCHAAR:  Um, the people that [Marketer 2] gave me that I gave to you, um, [Marketer 2] asked me do you have a doctor to write 'em?  And that's when I came to you.  And these are [Marketer 2's] people cause you met 'em all with [Marketer 2], correct?

DIAZ:  Believe it or not I don't even know [Marketer 2's] name anymore.

SCHAAR:  Yeah, yeah.

DIAZ:  This was two years ago.  This was back in fifteen.

SCHAAR:  I mean, I, everybody I gave to you came from [Marketer 2], the [individual] you met in um, um.

---

[4] Where "[Marketer 2]" is inserted, Marketer 2's first name actually used.

DIAZ:  Well as far as you or I are concerned, we haven't met this year or talked. That's why I didn't wanna do anything over the phone.

*Id*. at 4.

\*\*\*

SCHAAR:  If – I mean if they ask you where did these, where who knew these patients-

DIAZ:  (UI)

SCHAAR:  I came, I came to you and I told you were they came from.

DIAZ:  Yeah you refer-, I'm using you as referral base.

SCHAAR:  But where did I get 'em from, and I told you that each time.

DIAZ:  I didn't, I didn't, I'm going to say I didn't know because until you told me [Marketer 2's] name, I didn't remember it.

SCHAAR:  Remember when I asked you ta- ta to do 'em.  I said these come from a [person] up at the pharmacy.

DIAZ:  Yeah, but I don't remember [Marketer 2's] name.  I don't remember the names of all those people I met up there.

SCHAAR:  But you remember when I brought you the prescriptions it came from-

DIAZ:  I'm not denying it, I'm not denying it.

SCHAAR:  Do you remember that though?

DIAZ:  I do remember you saying that, but we don't to say that (pause) because that implies that I'm giving a prescription without seeing them.  The only thing you need to do is say, that uh, the only thing that I'm going to say is that you referred these people to me cause they were having trouble with their, uh, pain medicine.

SCHAAR:  Well they do.  All these people had scripts before from other doctors and, and, and-

DIAZ:  Well that's, that's exactly right.  That's the truth.

SCHAAR:  Cause they have them, and they have them in the Advantage's system and, and it's, and, and you know [Marketer 2] would call me and say, 'Oh they can't get this from this doctor (UI)' –

DIAZ:  But, don't, don't say [Marketer 2], don't say anything.  Just say that you to me about 'em.

SCHAAR:  But between you and me, we know where they came from.

DIAZ:  Well until you mentioned [Marketer 2's] name, I had totally forgotten it.

SCHAAR:  But you're, but you do remember I said somebody from the pharmacy.

DIAZ:  Right.

*Id*. at 10-11.

\*\*\*

SCHAAR:  Have you told your attorney about [Marketer 2]?  And that I brought [Marketer 2] to you?

DIAZ:  Why do you keep saying that?  No, because I didn't, I didn't remember [Marketer 2].

SCHAAR: Mkay.

DIAZ:  Until you brought him up right now I had no idea who those people are or what they were.  (Pause).  If you want to say [Marketer 2], that's your business.  [Marketer 2] was your contact.  My contact is you.  I had no contact with the drug store until I asked them to send me copies of the medical, you know, of all those scripts I wrote.

SCHAAR:  Umm hm.

DIAZ:  That's the first and only time I talk to the pharmacist and that was after the government came and wanted copies.  I said, 'Ah fuck, I don't have anything and that's when'-

SCHAAR:  I remember you callin' and gettin' everything.

DIAZ:  That's when I got in touch with you and said, 'I gotta see these people.'  Don't volunteer any information and don't lie.  (Pause).  See, you volunteered [Marketer 2's] name to me.  Don't volunteer it.  Don't say anything, just answer the questions and have an attorney cause if you don't.  Cause that will keep you out of trouble.

*Id*. at 14-15.

\*\*\*

DIAZ:  You see cause I'm not, I'm not supposed to sign a prescription unless I've seen and examined the patient.  And I signed the prescriptions without seeing them.

SCHAAR:  Mhm.

DIAZ:  That's, that's against the law.

*Id*. at 7.

As detailed in the recorded January 31 Meeting, the Defendant was aware that Marketer 2, specifically by name, was from whom Schaar obtained the beneficiaries PII and with whom the Defendant traveled with to see the beneficiaries after the TRICARE audit commenced in December 2015.

**C.     March 28, 2017**

After one initial meeting with the Defendant's then-attorney (Counsel 1) in February 2017, the Defendant, together with his counsel (Counsel 2), met with the government on March 28, 2017 ("March 28 Meeting").[5]

*1.  Proffer Letter*

At the outset of the March 28 Meeting, counsel for the Defendant requested, and the government agreed, that the meeting would proceed in accordance with the United States Attorney's Office for the Southern District of Mississippi's standard proffer agreement ("Proffer Letter").  *See* Ex. 3.  Although the Defendant did not ultimately execute the agreement, the government is operating as if the Defendant had.  Among other provisions, the Proffer Letter specifically provides in part:

> **First**, the United States requires a completely truthful statement in this proffer.  The term "truthful" as used here has two meanings: the statement must be both honest as well as complete.  Anything less renders the statement virtually useless because his credibility is weakened, if not destroyed.

---

[5]  The interview reports are being sent to the Court and resent to defense counsel with a courtesy copy of this motion *in limine*.  These reports have already been produced to the defense.

**Second**, *if your client knowingly makes a false statement, or if the statement is not substantially accurate and complete, the promises by the government in this letter are null and void.*

**Third**, no statements or information provided by your client during the proffer will be used against your client in any criminal case during the government's case in chief.  That is, however, the only limitation on the use the government may make of your client's statements.

\*\*\*

**Sixth**, the government may use any statements made or other information provided by your client to rebut evidence or arguments materially different from any statements made or other information provided by your client.  This provision is necessary to assure that no court or jury is misled by receiving information materially different from that provided by your client.  In addition, we want to emphasize that the above-mentioned examples are not totally inclusive of the uses the government may make of your client's proffer.

*Id.* (emphasis added).  The Proffer Letter is premised on the interviewee providing complete and truthful information, and in exchange for that promise, the government agrees not to use information provided during an interview against the interviewee in a subsequent prosecution.  *Id.*, at ¶¶ 1 and 3. If the interviewee is untruthful or does not provide accurate and complete information, the protection afforded by the agreement is null and void and the government can use any statement provided by the interviewee during its case-in-chief in a subsequent trial against that person.  *Id.*, at ¶ 2.  The government also reserves the right to use statements made by the interviewee to rebut any subsequent arguments that are materially different from statements made during the interview.  *Id.* at ¶ 6.

### 2.  *Ketamine, Wellness Capsules, and Refills*

With these understandings in place, the Defendant agreed to proceed with the interview.  During the March 28 Meeting, the Defendant admitted signing prescriptions for compounded prescriptions that Schaar brought him that included pain creams and/or scar creams.  Additionally, the Defendant acknowledged that the PII had been filled-in on the preprinted prescriptions forms

by Schaar prior to the Defendant receiving the forms, but that he, the Defendant, placed "X" marks in the boxes next to the pain cream and/or scar cream that he ultimately prescribed.  However, the Defendant indicated that at the time he signed the forms, refills were not authorized, nor did he prescribe wellness capsules.  The Defendant explained that the inclusion of ketamine in the pain creams, refills, and wellness capsules on the forms were added after the forms were returned to Schaar, and that he did not prescribe those items or authorize refills.

### 3.  Marketer 2

Moreover, during the March 28 Meeting, the Defendant denied knowing Marketer 2. Specifically, the Defendant denied that Marketer 2 was present in January 2016 when he and Schaar went to meet with beneficiaries so that the Defendant could examine them in order to create falsified patient records in connection with the TRICARE audit: "When specifically asked if [Marketer 2] went with them, the Defendant insisted that it was only Schaar and Defendant who participated in these pre-lunch meetings."  (3/28/17 Int., at 6, ¶ 34).  The Defendant also denied knowing that Schaar obtained the TRICARE beneficiary information (for whom the Defendant authorized the compounded prescriptions at issue) from Marketer 2.  (*Id*. at 5, ¶ 26).  The Defendant also stated that he never met Marketer 2: "When specifically asked if he has ever met [Marketer 2], Defendant responded that the name [Marketer 2's first name] sounded familiar and that he knows some [Marketer 2's first name].  In the end, Defendant said that he didn't recall any patients named [Marketer 2's first name], doesn't recall anyone associated with the pharmacy named [Marketer 2's first name], and doesn't recall ever meeting [Marketer 2]."  (*Id*., at 9, ¶ 51).

### D.     May 16, 2017

In an effort to facilitate truthfulness, and ultimately the Defendant's cooperation, the government invited the Defendant, together with his then counsel (Counsel 2) to meet with the

government and review portions of his recorded statements with Schaar from the January 31 Meeting.  During this meeting, the government again impressed upon the Defendant the need for the Defendant to be truthful with the government if he wished to cooperate.

### E.     May 26, 2017

On May 26, 2017, the Defendant, together with his then counsel (Counsel 2) again met with the government with the understanding that the proffer protections as agreed to in March 2017 were still in place ("May 26, Meeting").

#### 1.   *Ketamine, Wellness Capsules, and Refills*

During the May 26 Meeting, the Defendant again stated that he believed only the PII was filled in when Schaar provided the preprinted prescriptions to him, and that he later put X marks next to the pain cream and scar cream he wanted to prescribed.  The Defendant further maintained that he did not believe he prescribed wellness capsules.  However, upon agreeing that the X mark next to where he was supposed to sign the prescription was the same as X marks indicating which pain cream, scar cream, and wellness capsules were being prescribed, the Defendant acknowledged that the forms may have been pre-completed in their entirety before he signed the forms.

#### 2.   *Marketer 2*

Moreover, during the May 26 Meeting, the Defendant admitted that on the day he and Schaar traveled to Hattiesburg to see TRICARE beneficiaries during the audit, they picked up Marketer 2, who traveled around with them.

### F.     July 25, 2017

After the May 26 Meeting, the Defendant retained new counsel (Counsel 3), who currently represents the Defendant.  At current counsel's request, the government again met with the Defendant and current counsel on July 25, 2017 to discuss the government's investigation.

G.     **August 17, 2017**

On August 17, 2017, the government again met with current counsel to further discuss the investigation ("August 17 Meeting").  The Defendant did not attend this meeting.  During the August 17 Meeting, defense counsel insinuated that the prescriptions at issue were changed or modified after the Defendant had authorized them, namely, arguing that the Defendant did not authorize refills, wellness capsules, or ketamine.  The defense took the same position as he did during the March 28 Meeting, which was inconsistent with the Defendant's position during the May 26 Meeting.

However, the Defendant, through counsel, at the August 17 Meeting displayed to the government an original prescription that the Defendant had maintained in his custody.  On that original prescription, as maintained by the Defendant, all boxes had been checked, not only the boxes prescribing pain cream and scar cream, but also the boxes prescribing wellness capsules as well as refills.  The government subsequently subpoenaed, and received from the Defendant, additional original prescriptions maintained by the Defendant wherein the Defendant prescribed pain cream, scar cream, and wellness capsules, as well as authorized refills of each.

## LEGAL STANDARD

Proffer agreements are interpreted in accordance with general principles of contract law. *United States v. Fulbright*, 804 F.2d 847, 852 (5th Cir. 1986).  The government may be released from any promises in a proffer agreement if it establishes by a preponderance of the evidence that the defendant materially breached his commitment under the agreement. *See United States v. Davis*, 393 F.3d 540, 546-47 (5th Cir. 2004).  A material breach deprives the non-breaching party of the benefit of its bargain. *Davis*, 393 F.3d at 546-47.  A defendant has a due process right to have the court determine whether a material breach occurred; the court can decide the issue as a

12

matter of law when there is no factual dispute.  *United States v. Castaneda*, 162 F.3d 832, 836 (5th Cir. 1998); *United States v. Titus*, 547 F. App'x 464, 468 (5th Cir. 2013); *see also United States v. Tarrant*, 730 F. Supp. 30, 31 (N.D. Tex. 1990) ("When the government believes that a defendant has breached the terms of a proffer agreement and then wishes to rescind its part of the bargain, the government must prove to the court by a preponderance of the evidence that the defendant materially breached the agreement.  Where the facts are not in dispute, the court may determine breach as a matter of law." (internal citations omitted)).

## ARGUMENT

The proffer protections afforded to Defendant's interviews with the government that took place on March 28, 2017 and May 26, 2017 no longer apply because the Defendant's false statements about Marketer 2 was a material breach of the proffer agreement.  Given that the Defendant materially breached the proffer agreement with the government by lying, the government should be allowed to use the statements that Defendant made in these interviews during its case-in-chief.  *See United States v. Ballis*, 28 F.3d 1399, 1409-1410 (5th Cir. 1994) ("[I]f a defendant materially breaches his commitments under a plea agreement, the government is released from its obligations under that compact and may bring a new indictment on previously dismissed charges, regardless of what it may have promised earlier.").  Simply put, the Defendant should not be able to procure the benefit of his bargain with the government as a result of his untruthfulness.[6]

---

[6]  If the Defendant testifies at trial and that testimony is inconsistent with statements made during these prior interviews, the government can call a witness to impeach the Defendant's trial testimony with the interview statements. *See United States v. Palacios*, 556 F.2d 1359, 1363 (5th Cir. 1977) ("It is a well-established principle of evidence that prior inconsistent statements of a witness are admissible to impeach that witness.").  The proffer agreement specifically provides that the government can use statements made in a proffer interview at trial to cross-examine an interviewee whose trial testimony conflicts with statements made during the proffer interview.  (Ex. 3, at ¶ 5).

Specifically, during the March 28 Meeting, the Defendant denied knowing or having ever met Marketer 2.  This statement was a lie and a material breach of the proffer agreement. *See United States v. Donahey*, 529 F.2d 831, 832 (5th Cir. 1976) (holding that the defendant materially breached a cooperation agreement by providing evasive and misleading answers); *United States v. Reardon*, 787 F.2d 512, 516 (10th Cir. 1986) (holding that the defendant breached the cooperation agreement by failing to provide a full accounting of his own activities); *United States v. Nesbitt*, No. 2:08-cr-1153, 2010 WL 3701337, at *3 (D.S.C. Sept. 14, 2010) ("Failure to be fully truthful in the proffer—when the proffer requirement requires truthfulness—is one way that defendants can breach their proffer agreements.").

Indeed, during the recorded January 31 Meeting, Schaar discussed Marketer 2 in detail with the Defendant.  Schaar told the Defendant in that conversation that Schaar obtained the beneficiary information from Marketer 2.  Schaar also reminded the Defendant that the Defendant had met Marketer 2 on a previous occasion.  Although the Defendant was evasive in that conversation as to whether he remembered meeting Marketer 2, he was undoubtedly aware of the identity of Marketer 2 after that conversation, which occurred almost two months before the March 28 Meeting with the government.  Instead of being forthcoming about his knowledge of Marketer 2 and Marketer 2's role in the scheme during that meeting, the Defendant did exactly what he told Schaar he would do during this recorded conversation: not volunteer any information to the government.  Even worse, in addition to his lack of candor, the Defendant's decision to withhold information resulted in his affirmative misstatements about his dealings with Marketer 2.  At the Defendant's upcoming trial, Schaar will also testify that the Defendant met with Marketer 2 when the Defendant was trying to meet with the beneficiaries for whom he had authorized the

prescriptions for compounded medications at issue.  The Defendant ultimately corroborated this fact during the May 26 Meeting.

The government's proffer agreement with the Defendant was premised on the Defendant's providing complete and truthful information.  Despite the protections afforded in this agreement, the Defendant proceeded with March 28 Meeting knowing full well that he would not tell the government everything that he knew about his involvement with the scheme at issue.  *See United States v. Okeayainneh*, No. 11 CR 87, 2012 WL 12951186, at *5 (D. Minn. Jan. 23, 2012) ("Defendant explicitly agreed to the terms of the proffer letter.  Defendant then plotted before the proffer to provide false and misleading information to attempt to thwart the Government's investigation, and, in fact, during the proffer provided this misleading information.  The entire proffer statement is admissible.").

The Defendant's lies during the March 28 Meeting vitiate the protections afforded in the agreement—namely the promise from the government that it would not use information provided by the Defendant in a subsequent prosecution.  Because the Defendant lied, the proffer agreement is null and void, and the government should be allowed to introduce statements that the Defendant made in its case-in-chief.  *See Davis*, 393 F.3d at 546-47 (affirming the district court's decision to deny a motion to dismiss an indictment while holding that the defendant materially breached the promise in his plea agreement to provide complete and truthful information when lying about his role and another's role in a bribery scheme); *United States v. Reed*, 272 F.3d 950, 955 (7th Cir. 2001) (holding that the defendant breached his proffer agreement when he lied about the extent of his methamphetamine manufacturing and that the government was free to use the defendant's statements against him at trial); *United States v. Seeright*, 978 F.2d 842, 846 (4th Cir. 1992) ("Once the district court found that [the defendant] had materially breached the [proffer] agreement, the

government was free to use [the defendant's] statements from the proffer session."); *Tarrant*, 730 F. Supp. at 32 ("[P]roffer agreements cannot be unilaterally broken with impunity or without consequence. Having failed to perform his obligations, the Proffer Letter provides that Defendant is no longer entitled to the government's promise of non-prosecution or the promise that his statements would not be used against him." (internal quotation marks and citations omitted)).

Moreover, although the Defendant has already materially breached the proffer agreement by lying about Marketer 2, the government anticipates that the defense will also contradict statements that the Defendant previously made.  Namely, the government anticipates that the defense will cross-examine Schaar in an attempt to argue that the preprinted prescriptions forms were changed *after* the Defendant authorized them.  As noted, however, the Defendant previously admitted during the interviews with the government that he knew what he was prescribing when he authorized the prescriptions at issue.  That the Defendant had original copies of the preprinted prescription forms at issue further undercuts this anticipated argument that Schaar or someone at Advantage changed the prescriptions after the Defendant authorized those prescriptions.

If the defense proceeds with this line of cross-examination with Schaar or any other government witness, the government should be allowed to introduce in its case-in-chief the statements that the  Defendant where he acknowledged authorizing the prescriptions forms at issue that were already filled out without seeing any of the beneficiaries.  *See United States v. Hardwick*, 544 F.3d 565, 570-71 (3d Cir. 2008) (holding that the defense's cross-examination of a government witness that contradicted the defendant's statements in a proffer interview waived the protections of the proffer agreement); *United States v. Krilich*, 159 F.3d 1020, 1025-26 (7th Cir. 1998) (holding that the court properly allowed the government to admit the defendant's proffer statements when the defense's cross-examination of a government witness advanced a position

16

that was inconsistent with the proffer).  Paragraph 6 of the Proffer Agreement also specifically permits the government to use the Defendant's statements to rebut such arguments.  Ex. 3, ¶ 6. Thus, the government should also be allowed to introduce the Defendant's proffer statements if the defense's cross-examination of government witnesses contradicts the Defendant's prior statements in the interviews.

## CONCLUSION

WHEREFORE, for the reasons stated herein, the government respectfully requests that the Court grant its motion *in limine* and allow the United States to use the Defendant's statements made during the proffer protected interviews during its case-in-chief.

Dated: January 24, 2018                    Respectfully submitted,

D. MICHAEL HURST, JR.
UNITED STATES ATTORNEY

By:     s/ Jared L. Hasten

Mary Helen Wall (MS Bar #100857)
Assistant United States Attorney
501 E. Court Street, Suite 4.430
Jackson, Mississippi 39201-0101
Telephone: (601) 965-4480
Fax: (601) 965-4409
mary.helen.wall@usdoj.gov

Katherine E. Payerle (NC Bar #36897)
Jared L. Hasten (IL Bar #6296695)
Trial Attorneys
U.S. Department of Justice
Criminal Division, Fraud Section
1400 New York Ave., N.W.
Washington, D.C. 20005
Telephone: (202) 816-9269
katherine.payerle@usdoj.gov
jared.hasten@usdoj.gov

## CERTIFICATE OF SERVICE

I, Jared L. Hasten, hereby certify that on this day, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all parties of interest.

On this, the 24th day of January, 2018.

s/ Jared L. Hasten
Jared L. Hasten
Trial Attorney