# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### EASTERN DIVISION

**UNITED STATES OF AMERICA**

**v.**                                          **CRIMINAL NO. 2:17-CR-31-KS-JCG**

**ALBERT DIAZ**

### MEMORANDUM OPINION AND ORDER

For the reasons below, the Court **denies** Defendant's Motion for New Trial [100] and likewise **denies** Defendant's Motion for Revocation or Amendment [97] of the Magistrate Judge's Order [86] denying bond pending sentencing.

### I. BACKGROUND

Defendant was indicted on sixteen counts of various crimes related to a conspiracy to defraud Tricare, a federal health care benefit program. Specifically, Defendant was charged with 1) conspiring to commit wire fraud; 2) conspiring to defraud Tricare; 3) four counts of wire fraud; 4) conspiring to distribute a Schedule III controlled substance outside the scope of professional practice and without a legitimate medical purpose; 5) four counts of distributing a Schedule III controlled substance outside the scope of professional practice and without a legitimate medical purpose; 6) conspiring to falsify entries in patient files and/or Tricare audit forms with the intent of impeding or obstructing a federal grand jury investigation; and 7) five counts of falsifying entries in patient files and/or Tricare audit forms with the intent of impeding or obstructing a federal grand jury investigation. On March 2, 2018, a jury of Defendant's peers found him guilty on all sixteen counts.

On March 6, 2018, Defendant filed a Motion for Bond [79] pending sentencing, which the Government opposed. The Magistrate Judge held a bond hearing, and on March 13, 2018, he denied [86] Defendant Motion for Bond [79]. The Magistrate Judge found that Defendant had not presented sufficient evidence to overcome the presumption against granting bond after conviction. Specifically, he found that Defendant had not established that there was a substantial likelihood that a motion for new trial would be granted, or presented clear and convincing evidence that he was neither a flight risk nor a danger to the community.

On March 23, 2018, Defendant filed a Motion for Revocation or Amendment [97] of the Magistrate Judge's order denying his Motion for Bond. The Court construed the motion as seeking the District Judge's review of the Magistrate Judge's Order [86] denying bond pending sentencing. On April 5, 2018, Defendant filed a Motion for New Trial [100]. Both motions are ripe for the Court's review.

## II. MOTION FOR NEW TRIAL [100]

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." FED. R. CRIM. P. 33(a). Rule 33 "goes to the fairness of the trial rather than to the question of guilt or innocence." *United States v. McRae*, 795 F.3d 471, 481 (5th Cir. 2015). "[D]istrict courts have wide discretion with respect to Rule 33 motions." *United States v. Mahmood*, 820 F.3d 177, 190 (5th Cir. 2016). However, "Rule 33 motions are disfavored and reviewed with great caution." *United States v. Pratt*, 807 F.3d 641, 645 (5th Cir. 2015). "Generally, . . . the trial court should not grant a motion for new trial unless there would be a miscarriage of justice

or the weight of evidence preponderates against the verdict." *United States v. Wall*, 389 F.3d 457, 466 (5th Cir. 2004).

## A.   *Implied Juror Bias*

First, Defendant argues that the Court should have imputed bias to the jury and declared a mistrial. Specifically, Defendant contends that the events on the final day of trial related to Juror 1 created in every other juror a substantial emotional involvement in the case which adversely affected their impartiality. But the facts do not support Defendant's argument.

### 1.   *What Happened*

After the jury instruction conference on the final day of trial, the Court Security Officer ("CSO") informed the undersigned judge's staff that one of the jurors – Juror 1 – was upset and crying in the bathroom because she believed she had been threatened by the Defendant's family. The Court immediately sequestered Juror 1 from the rest of the jury and began an inquiry. Transcript of Jury Trial Vol. V at 42, *United States v. Diaz*, No. 2:17-CR-31-KS-JCG (S.D. Miss. May 2, 2018), ECF No. 110. Juror 1 stated that when she went through the security checkpoint on Thursday, two ladies who had been sitting behind Defendant were in line ahead of her. *Id.* at 42-43. The CSO did not recognize Juror 1 until she had already gone through the metal detector. *Id.* at 43-44. He explained, "I thought you were with them," referring to the two ladies in line ahead of Juror 1. *Id.* at 44. Juror 1 answered, "No," but according to her, one of the ladies said, "Yes, she is. She's with us." *Id.*

This comment made Juror 1 uncomfortable because she recognized them from the courtroom. *Id.* She explained:

> So I thought about it all day yesterday and just kind of said, well, maybe, you know, it's nothing. But I had just an uneasy instinct . . . about it. And I just felt like y'all needed to know. But I held off yesterday. But this morning I did mention it to some of the ones in there, . . . and I said, I'm going to hang with y'all. I wasn't discussing anything; I was just saying I felt uncomfortable coming in the building.

*Id.* But she specifically denied having attributed her discomfort to the Defendant when speaking with the other jurors. *Id.* at 44-45. Juror 1 then told the Court that two of the other jurors waited for her outside the courthouse, and one of them said to her as she walked up, "We were waiting on you." *Id.* at 45. She mistook the other jurors for the ladies from the security checkpoint the day before, and she reported it to the CSO because she "felt very uncomfortable." *Id.* at 46. However, she admitted that nobody actually threatened her. *Id.* at 47, 51. In the end, Juror 1 claimed that she had told the other jurors that she felt "uncomfortable going out of the courthouse," *id.* at 47, 49, but she denied having attributed her discomfort to the Defendant. *Id.* at 44-45, 49. The Court then excused Juror 1 from jury service. *Id.* at 49-50.

To determine whether the jury had been tainted, the Court continued its inquiry by speaking with the rest of the jury as a group. *Id.* at 53. When the Court asked whether Juror 1 had spoken with anyone about her reason for being upset, multiple jurors nodded affirmatively. *Id.* One juror answered: "She said . . . that she thought that Diaz and I guess his wife came up behind her. . . . And we, we picked at her a little bit." *Id.* Juror 4, one of the ladies who waited outside the courthouse for Juror 1,

answered:

> We . . . were waiting in the parking lot because we didn't want her to be paranoid like she was yesterday. So we waited in the parking lot for her to get out of her truck . . . . As she come by and I said, we were waiting on you to walk in, and she didn't even say anything to us. She just went by us. . . . I guess she thought I was somebody – one of the dark-haired ladies on Diaz's side or something. And she didn't wait for us or anything.

*Id.* at 53-54. According to the other jurors, Juror 1 did not realize that the two ladies waiting for her outside the courthouse were, in fact, other jurors. *Id.* at 55.

Juror 6 then told the Court that Juror 1 had described "a man, a gray-headed man . . . in the stairwell." *Id.* at 57. Another Juror continued: "[S]he said somebody entered the stairwell, . . . and it was a man . . . . She told us it was yesterday morning and night before last, . . . and they came up from behind her from the stairwell." *Id.* According to the jurors, Juror 1 never said it was the Defendant, but they "felt like that's what she was leading on about." *Id.*

The Court then informed the attorneys of what the jurors had said. *Id.* at 58-59. Defendant's counsel immediately moved for a mistrial, but the Court deferred ruling. *Id.* at 59. Instead, the Court spoke with each remaining juror individually, on the record, with one attorney from each side present. *Id.* at 61. The Court also took recommendations from each side's attorneys regarding what questions to ask. *Id.* at 61-65. After the Court examined each juror individually, Defendant's counsel again moved for a mistrial, and the Court denied the motion. *Id.* at 100-01. The Court ruled that Juror 1 would be released from service and escorted from the courthouse to ensure no further contact with the remaining jurors. *Id.* at 101.

After a brief recess, Defendant's counsel brought to the Court's attention precedent requiring the Court to examine each juror under oath, and to permit the attorneys to examine them. *Id.* at 102-04; *see United States v. Sylvester*, 143 F.3d 923, 935 (5th Cir. 1998) ("Counsel for both sides shall be given the opportunity to examine the jurors on the record, under oath.").[1] Therefore, the Court re-examined each juror under oath[2] and gave counsel for the Government and Defendant an opportunity to question each of them. Transcript Vol. V [110], at 108-61. After the additional examination had concluded, Defendant's counsel renewed the motion for a mistrial, and the Court denied it. *Id.* at 160-61. The Court held: "There's been nothing that shows anything other than this lady was, unfortunately, . . . just overly anxious and paranoid, and she jumped to some conclusions . . . that were baseless." *Id.* at 161.

2. *What the Other Jurors Said*

Rather than provide a full account of each juror's testimony, the Court will provide relevant highlights:

- Juror 2 said that Juror 1 "thought that somebody was trying to follow her up the stairs or something. She kept saying a man with white hair . . . ," but she did not identify the person as Defendant. *Id.* at 122. But Juror 2 denied that she had felt any intimidation

---

[1]This case differs from *Sylvester* in numerous respects. The Court did not conduct its entire inquiry *ex parte.* Counsel for each side was present while the Court individually questioned each juror, and each side had an opportunity to question each juror under oath. The Court questioned Juror 1 *ex parte* before informing counsel of what had occurred, but neither Defendant nor the Government requested an opportunity to further examine her.

[2]After being placed under oath, each juror adopted and affirmed their previous statements to the Court.

or that anyone had tried to intimidate her. *Id.* at 72. She said that all the other jurors "thought that [Juror 1] was being a little paranoid because . . . she was nervous about the case." *Id.* at 73. She said that Juror 1 was embarrassed at having believed that two of the other jurors were other persons trying to follow her. *Id.* at 73, 123. But Juror 1 did not identify the other persons as associated with Defendant. *Id.* at 123-24. In Juror 2's opinion, Juror 1 overreacted. *Id.* at 74.

• Juror 3 was one of the jurors who attempted to meet Juror 1 in the parking lot on the final day of trial. *Id.* at 81-82. She said that Juror 1 had "said something about a white-headed man in a stairwell," and had acted "a little paranoid about it." *Id.* at 81, 134. Juror 1 did not indicate that the man was Defendant. *Id.* at 135. The other jurors walked to lunch with her "to make her feel more comfortable," and three jurors, including Juror 3, waited in the parking lot for her on the final morning of trial to help her "feel comfortable walking up . . . ." *Id.* at 81, 136. Juror 1 walked past the three other jurors in the parking lot, not acknowledging them. *Id.* at 136-37. When she arrived in the jury room, Juror 1 said that people had tried to contact her. *Id.* at 137. Juror 3 corrected her, identifying the three jurors who had waited for her, and Juror 1 "went into the bathroom and got upset." *Id.*

Juror 3 denied that anyone had attempted to contact her, and that she had felt intimidated in any way. *Id.* at 82. In her opinion, Juror 1 had overreacted because "maybe she's a paranoid person and this has gotten to her." *Id.* at 82, 138. Juror 3 affirmed that she could be fair to each side. *Id.* at 83. She specifically testified that she did not attribute these events to Defendant or his family. *Id.* at 137-38.

• Juror 4 came in after Juror 1 was already crying in the bathroom. *Id.* at 95. He said, "Yesterday she had been saying that she was . . . concerned, but we . . . told her that she needed to talk to someone, and she didn't, so we assumed that she . . . recognized it as her own paranoia." *Id.* He said no one "other than her ha[d] been concerned or felt threatened in any way, so [the other jurors] all thought it was kind of humorous." *Id.* They "didn't think [Juror 1] took it as seriously as . . . she apparently did." *Id.* In fact, Juror 4 said that he "didn't give it a whole lot of credence because her story was not consistent." *Id.* at 156.

7

He denied that these events would have any effect on his ability to be fair. *Id.* at 95. And he specifically testified that he did not attribute any of these events to Defendant or his family. *Id.* at 156.

- Juror 5 said that Juror 1 believed that "a gray-headed fellow" had come "up behind her, got close behind her in the hall." *Id.* at 109-10. But the other jurors had "shrugged . . . off" Juror 1's issues as "just her being paranoid . . . ." *Id.* at 66-67. He believed that she was overreacting. *Id.* at 66.

  He denied that any person had tried to intimidate the jury, and he said that nothing had occurred that would prevent him from giving Defendant a fair trial. *Id.* at 67, 110. He also specifically denied that the events were "in any way connected to" Defendant or his family. *Id.* at 110.

- Juror 6 said that Juror 1 was "shook up" because she believed that "some of maybe the defense side" or "a gray-haired man" came into the stairwell with her and spoke to her. *Id.* at 75, 126. In an effort to ease Juror 1's distress, other jurors walked out with her. *Id.* at 75.

  Juror 6 denied having felt any type of intimidation or discomfort, and she affirmed that she could continue to be fair to each side in the case. *Id.* at 76, 127. She specifically testified that she did not associate these events with Defendant or his family. *Id.* at 127. In her opinion, Juror 1 overreacted. *Id.* at 76.

- Juror 7 said that Juror 1 had been "paranoid all day" on the next to last day of trial. *Id.* at 77-78, 129. According to Juror 7, Juror 1 had mistakenly told the CSO that she was with other people who were not jurors, and Juror 1 believed that she had been followed in the stairwell by a "gray-headed person." *Id.* at 130. She said that the jurors all "went to lunch together . . . and stayed with [Juror 1] because she was so paranoid." *Id.* at 78. On the final day of trial, Juror 1 had not recognized three other jurors waiting for her in the parking lot and believed they were other persons attempting to contact her. *Id.* at 131. The other jurors were "just picking, you know, laughing about" it, and "all of a sudden she got embarrassed, . . . and . . . started crying and went to the bathroom . . . ." *Id.* at 78, 131. According to Juror 7, Juror 1 overreacted. *Id.*

at 79.

Juror 7 denied that she had been intimidated, and that anyone had attempted to contact her. *Id.* at 79. She affirmed that she could continue to be fair in the case, and she specifically testified that she did not associated any of these events with Defendant or his family. *Id.* at 79, 131.

- Juror 8 came in after Juror 1 was already crying in the bathroom. *Id.* at 85. But he said she had been "very distraught yesterday because she said . . . a man had said 'good morning' to her and then followed her up the stairs." *Id.* at 86. Juror 8 believed "it was harmless," and that Juror 1 had no reason "to be afraid or paranoid." *Id.* He said, "She's a little bit more emotional when it comes to this kind of stuff, I guess. Because yesterday she just seemed really distraught and so I guess it was just a little too much for her." *Id.* at 87. Juror 8 believed that Juror 1 was "just a little nervous, and it was getting to her . . . ." *Id.* at 144.

  He denied that he had felt intimidated, and that he had noticed anything which would give anyone a reason to be concerned for their safety. *Id.* at 86. He affirmed that he could continue to be fair to each side in the case. *Id.* He also specifically testified that he did not attribute these events to Defendant or his family. *Id.* at 144.

- Juror 9 said that Juror 1 had "felt that somebody was coming in behind her in the stairs . . . ," and that three of the ladies on the jury waited on her in the parking lot "just because they felt that she felt uncomfortable . . . ." *Id.* at 89-90, 149. Juror 9 said that Juror 1 implied that the person following her up the stairs was Defendant. *Id.* at 150. He said that he had advised her to tell the Court if she felt uncomfortable, but that "she laughed it off, and . . . was just carrying on." *Id.* at 90. Therefore, the rest of the jury "thought it was . . . no big deal," and that she was "over it . . . ." *Id.*

  Juror 9 denied that any of these events would impact his ability to be fair to both sides of the case. *Id.* He specifically testified that he did not attribute any of these events to Defendant or his family. *Id.* at 151.

- Juror 10 said that Juror 1 had mentioned that she "felt like somebody was behind her in the stairwell . . . ," and that the

person told her, "Good morning." *Id*. at 83, 139-40. Juror 10 said that "the idea that [he] got" was that Juror 1 believed it was Defendant or someone associated with him. *Id*. at 140. On the final morning of trial, she came into the jury room and said someone had been waiting for her in the parking lot. *Id*. at 84. Juror 3 responded, "That was me," and "everybody started laughing." *Id*. at 84, 140. According to Juror 10, "it was more of a case that [Juror 1] had her feelings hurt than anything. She went to the bathroom and you could tell that she was upset." *Id*. at 84.

Juror 10 denied having felt any intimidation, and that anyone had tried to contact him. He affirmed that these events would have no effect on his ability to be fair to each side. *Id*. He specifically testified that he did not believe that any person associated with Defendant tried to contact Juror 1, and he did not attribute these events to Defendant or his family. *Id*. at 140-42.

· Juror 11 said that Juror 1 had "mentioned that she thought somebody had followed her," but the other jurors "didn't know how serious she was . . . ." *Id*. at 87. He denied having felt intimidated, and that anyone had tried to contact him about the case. *Id*. at 88. He also denied that Juror 1 had said she was threatened. *Id*. at 146.

He affirmed that he could continue to be fair. *Id*. at 88. He believed that Juror 1 "overreacted, really paranoid," and that "she may have been that way before she ever come here . . . ." *Id*. at 88, 147. Juror 11 specifically testified that he did not attribute any of these events to Defendant or his family. *Id*. at 147.

· Juror 12 described Juror 1 as "a little paranoid." *Id*. at 97. According to Juror 12, Juror 1 "mentioned an encounter with someone in the stairwell," but Juror 12 "didn't take it serious" because she "just thought [Juror 1] was upset." *Id*. at 97, 158. Juror 12 and two other jurors waited in the parking lot to walk with Juror 1 "so she wouldn't have to walk in by herself." *Id*. at 97, 159. According to Juror 12, there was no reason that Juror 1 should have not recognized them after serving on the jury together for a week. *Id*. at 97. Juror 12 concluded that "it's just got to her; she's just . . . kind of paranoid." *Id*. at 98.

Juror 12 denied that anyone had attempted to contact her about

the case, and that these events would affect her ability to be fair. *Id.* at 99. She said: "Everybody's acted appropriate." *Id.* She specifically testified that she did not attribute these events to Defendant or his family. *Id.* at 160.

- Juror A-1 said that Juror 1 had said a man followed her up the stairwell, and that she believed it was Defendant trying to speak to her. *Id.* at 69, 113, 119. Juror 1 had also said that someone followed her to her car one day, prompting her to drive a different vehicle the next day. *Id.* at 113. In an effort to make Juror 1 feel better, other jurors walked with her to lunch and when it was time to leave for the day. *Id.* at 69, 114, 117.

  But Juror A-1 believed that Juror 1 had overreacted. *Id.* She said, "[T]here was nothing – nobody knows for sure if anybody ever even really tried to speak to her. . . . We just wanted her to feel safe because nothing's happened to any of us. . . . [N]obody's tried to say anything to us." *Id.* at 71. Accordingly, Juror A-1 said that nothing had occurred that would cause her to be unfair to either side. *Id.* at 71, 120.

- Juror A-2 said that Juror 1 had said that a "white-headed man said something to her" in the stairwell. *Id.* at 91, 152. The other jurors walked down with her that night, and some ladies waited in the parking lot the next morning "so . . . she'll feel safe . . . ." *Id.* at 91, 153. When one of the ladies greeted her, she "took off." *Id.* at 153. According to Juror A-2, Juror 1 "got embarrassed and overreacted" when the other jurors laughed at her. *Id.* at 93.

  Juror A-2 denied having felt any type of intimidation, that anyone had tried to contact her, or that these events would have any impact on her ability to be fair. *Id.* at 91. She believed that Juror 1 was paranoid. *Id.* at 94. She specifically testified that she did not attribute any of these events to Defendant or his family. *Id.* at 154.

In summary, every other juror believed that Juror 1 was paranoid and overreacted, and none of them actually believed that Defendant or anyone associated with him had followed her, spoken to her, or done anything to intimidate her. None of the remaining jurors attributed Juror 1's discomfort to Defendant or anyone associated

with him, and each one affirmed under oath that these events had no effect on their ability to be fair to each side and render an impartial verdict.

### 3. Implied Bias

Defendant contends that the Court should have imputed implied bias to the remaining jurors because of the events surrounding Juror 1. The Fifth Circuit provided the following explanation of the doctrine of implied bias:

> The Sixth Amendment guarantees in all criminal prosecutions that the accused receive a trial by an impartial jury. Although the Sixth Amendment does not prescribe any specific tests, the bias of a prospective juror may be actual or implied; that is, it may be bias in fact or bias conclusively presumed as a matter of law. The determination of implied bias is an objective legal judgment made as a matter of law and is not controlled by sincere and credible assurances by the juror that he can be fair. However it is only in extreme situations that implied juror bias may be found. Some examples might include a revelation that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction. Bias should not be inferred unless the facts underlying the alleged bias are such that they would inherently create in a juror a substantial emotional involvement, adversely affecting impartiality.

*Uranga v. Davis*, 879 F.3d 646, 652-53 (5th Cir. 2018) (citations and some punctuation omitted).

"The Supreme Court has never explicitly adopted or rejected the doctrine of implied bias," but it "has not looked favorably upon attempts to impute bias to jurors." *Andrews v. Collins*, 21 F.3d 612, 620 (5th Cir. 1994). "[D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation." *Smith v. Phillips*, 455 U.S. 209, 217, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982). "The safeguards of juror impartiality, such as *voir dire* and protective instructions from the

trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." *Id.* Therefore, due process requires "a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Id.*

The Fifth Circuit has imputed implied bias in situations where the defendant caused damage to a juror's property, *id.*, or where a juror was a family member of a law enforcement officer who investigated the case. *United States v. Scott*, 854 F.2d 697, 699 (5th Cir. 1988) (bias should have been imputed to juror whose brother was a deputy sheriff in the office that investigated the case against defendant). It has declined to imply bias where a juror was friends with a victim of the defendant, *United States v. Wilson*, 116 F.3d 1066, 1087 (5th Cir. 1997), *rev'd on other grounds, United States v. Brown*, 161 F.3d 256, 258 (5th Cir. 1999), and where a juror was attracted to the Government's attorney. *United States v. Scott*, 576 F. App'x 409, 414 (5th Cir. 2014). The Supreme Court has held that implied bias need not be imputed to a juror who has applied for employment in the prosecuting attorney's office. *Smith*, 455 U.S. at 217-18.

This case is wholly dissimilar to ones where the Fifth Circuit has imputed implied bias to a jury. None of the remaining jurors were employees of the prosecuting agency, close relatives of anyone associated with the trial, or involved in the criminal transactions that were the subject of the trial. *See Uranga*, 879 F.3d at 652-53; *Andrews*, 21 F.3d at 620. Defendant has not directed the Court to any precedent

applying the implied bias doctrine in a situation like this one. Accordingly, the Court declines to impute bias to the jury.

*4.     Actual Bias*

Defendant does not explicitly argue that the jury was *actually* biased against him as a result of Juror 1's actions, but several of his statements in briefing veer in that direction. For example, Defendant referred to an "antagonistic relationship between the jury and the Defendant during major portions of the trial." Memorandum Brief in Support of Defendant's Motion for New Trial at 3, *United States v. Diaz*, No. 2:17-CR-31-KS-JCG (S.D. Miss. Apr. 5, 2018), ECF No. 101. He also referred to the "jury's emotional engagement against" Defendant. *Id.* at 4. Although Defendant has not sufficiently raised the question of actual bias, the Court will address it in an abundance of caution.

"In any trial, there is the presumption that the jury is impartial and unbiased; it is incumbent upon the defendant to prove otherwise." *United States v. Wayman*, 510 F.2d 1020, 1024 (5th Cir. 1975). "[P]rejudice will not be presumed but . . . the defendant has the burden of proving prejudice by a preponderance of credible evidence. This burden must be sustained not as a matter of speculation but as a demonstrable reality." *Id.* Defendant has fallen far short of this standard of proof. The evidence undeniably demonstrates that the remaining jurors were not biased against him. Every one of them believed that Juror 1 was paranoid and overreacting. None of them believed that Defendant or anyone associated with him had followed her, spoken to

her, or done anything to intimidate her. None of them attributed Juror 1's discomfort to the Defendant or anyone associated with him, and each one affirmed under oath that these events had no effect on their ability to be fair to each side and render an impartial verdict.

5.    *"Banded Together"*

Finally, the Court feels compelled to correct a particularly egregious misrepresentation of fact from Defendant's briefing. Defendant's counsel repeatedly stated in briefing that the other jurors "banded together" to protect Juror 1 from the Defendant and his family. This is demonstrably false. No juror ever stated that they accompanied Juror 1 to the parking lot or rode with her to meals because they actually believed she was in danger or had been threatened by Defendant or his family. In fact, as the Court thoroughly documented above, *none* of the other jurors actually believed that Juror 1 had been threatened, approached, or contacted by anyone associated with Defendant. Instead, the jurors testified that they accompanied Juror 1 simply to make her feel better. Transcript Vol. V [110], at 69, 78, 81, 90, 97, 117, 132, at 141. They did not believe she was in danger; they were just being kind to a fellow juror who was, for whatever reason, distressed.

6.    *Summation*

For all of these reasons, the Court finds that Defendant's Sixth Amendment right to trial by an impartial jury was not violated. The jury that convicted Defendant was neither actually nor impliedly biased against him.

**B.    *The Schaar Recordings***

Next, Defendant argues that the Government's use of a co-conspirator to surreptitiously record conversations with him in a non-custodial, pre-indictment setting constituted a violation of his constitutional rights and the McDade Amendment. The Court thoroughly addressed these issues in a written order entered on February 21, 2018. *See* Order, *United States v. Diaz*, No. 2:17-CR-31-KS-JCG (S.D. Miss. Feb. 21, 2018), ECF No. 60. In the present motion, Defendant offered nothing that alters the Court's conclusion.

### 1.    *MRPC & the McDade Amendment*

First, Defendant argues that Government counsel violated the Mississippi Rules of Professional Conduct by inducing Schaar to communicate with Defendant outside the presence of Defendant's counsel. *See* Miss. R. of Prof. Conduct 4.2. Therefore, Defendant argues that the Government violated 28 U.S.C. § 530B(a), which provides: "An attorney for the Government shall be subject to State laws and rules, and local Federal court rules, governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State." 28 U.S.C. § 530B(a).

The Fifth Circuit directly addressed this issue and found that "professional disciplinary rules do not apply to government conduct prior to indictment . . . ." *United States v. Johnson*, 68 F.3d 899, 902 (5th Cir. 1995); *see also United States v. Heinz*, 983 F.2d 609, 613 (5th Cir. 1993). In fact, DOJ regulations specifically provide that 28 U.S.C. § 530B "should not be construed in any way to alter federal substantive, procedural, or evidentiary law . . . ." 28 C.F.R. § 77.1(b). Virtually every federal court

to address this issue has ruled that similar ethical rules do not apply to the investigatory phase of law enforcement.[3] Only one Circuit has applied a no-contact rule in a non-custodial, pre-indictment setting, and it still declined to suppress the recorded statements. *United States v. Hammad*, 858 F.2d 834, 842 (2nd Cir. 1988).

Defendant argued during trial that the Fifth Circuit decisions approving of such investigatory tactics predate the Ethical Standards for Prosecutors Act of 1998, which requires Government attorneys to abide by state rules governing attorneys. *See* 28 U.S.C. § 530B. However, the Court cited numerous authorities which post-date the Act yet reach the same conclusion. Moreover, only the United States Supreme Court or the Fifth Circuit sitting *en banc* can overrule prior Fifth Circuit panel decisions. *See United States v. Lipscomb*, 299 F.3d 303, 313 (5th Cir. 2002). Therefore, the Court must follow the Fifth Circuit's prior decisions on this issue.

Even if there were Fifth Circuit precedent holding that the Government's use

---

[3]*See, e.g. United States v. Brown*, 595 F.3d 498, 516 (3rd Cir. 2010); *United States v. Cope*, 312 F.3d 757, 773 (6th Cir. 2002); *United States v. Plumley*, 207 F.3d 1086, 1095 (8th Cir. 2000); *United States v. Lowery*, 166 F.3d 1119, 1125 (11th Cir. 1999); *United States v. Balter*, 91 F.3d 427, 436 (3rd Cir. 1996) (Alito, J.); *United States v. Powe*, 9 F.3d 68, 69 (9th Cir. 1993); *United States v. Ryans*, 903 F.2d 731, 739 (10th Cir. 1990); *United States v. Sutton*, 801 F.2d 1346, 1366 (D.C. Cir. 1986); *United States v. Fitterer*, 710 F.2d 1328, 1333 (8th Cir. 1983); *United States v. Elliott*, 684 F. App'x 685, 693-94 (10th Cir. 2017); *United States v. Grass*, 239 F. Supp. 2d 535, 542 (M.D. Penn. 2003); *United States v. Joseph Binder Schweizer Emblem Co.*, 167 F. Supp. 2d 862, 866 (E.D.N.C. 2001); *United States v. Marcus*, 849 F. Supp. 417, 421 (D. Md. 1994) (listing numerous cases); *In re Disciplinary Proceedings Re: Doe*, 876 F. Supp. 265, 268 (M.D. Fla. 1993); *United States v. Heine*, 2016 WL 6808595, at *22 (D. Ore. Nov. 17, 2016); *United States v. Sabean*, 2016 WL 5721135, at *5 (D. Me. Oct. 3, 2016); *United States v. Voigt*, 2015 WL 9581740, at *2 (D. Minn. Dec. 30, 2015); *United States v. Lash*, 2010 WL 5437275, at *4 (E.D. La. 2010).

of a co-conspirator to record conversations with a subject of investigation in a non-custodial, pre-indictment setting constitutes a violation of a state bar's no-contact rule, it does not necessarily follow that the indictment must be dismissed or the recordings suppressed. "Government misconduct does not mandate dismissal of an indictment unless it is so outrageous that it violates the principle of fundamental fairness under the due process clause of the Fifth Amendment." *United States v. Mauskar*, 557 F.3d 219, 231-32 (5th Cir. 2009). "Such a violation will only be found in the rarest circumstances." *Id.* To merit dismissal of the indictment, the Government's actions must be "shocking to the universal sense of justice." *United States v. Russell*, 411 U.S. 423, 432, 93 S. Ct. 1637, 36 L. Ed. 2d 366 (1973). The Fifth Circuit has declined to find outrageous conduct in far worse situations than this one. *See United States v. Sandlin*, 589 F.3d 749, 759 (5th Cir. 2009) (listing cases). Defendant cited no authorities indicating that the Government's conduct in the present case meets such a high standard.

"Suppression of evidence . . . has always been our last resort, not our first impulse." *United States v. Leon*, 468 U.S. 897, 907, 104 S. Ct. 3405 82 L. Ed. 2d 677 (1984). "There is no basis for judicial imposition of the exclusionary rule for a statutory violation when Congress has not provided that remedy." *United States v. Guerrero*, 768 F.3d 351, 358 (5th Cir. 2014).[4] Section 530B provides no remedy for violations of state

---

[4]*See also Sanchez-Llamas*, 548 U.S. at 348 (declining to apply exclusionary rule where Government violated federal statute); *United States v. Caceres*, 440 U.S. 741, 754-55, 99 S. Ct. 1465, 59 L. Ed. 2d 733 (1979) (violation of agency regulations does not merit application of exclusionary rule); *United States v. Guerrero*, 768 F.3d

professional responsibility rules. Likewise, the Mississippi Rules of Professional Conduct provide no remedy, and, in any case, this Court would not necessarily be required to adopt the state-law remedy. Even if the Government's actions constituted prosecutorial misconduct egregious enough to constitute a due process violation, the Court finds that the good faith exception to the exclusionary rule applies because, as noted above, there is overwhelming support in the case law for the Government's position. *See Heinz*, 983 F.2d at 614 (holding that even if prosecutors had violated ethical rules, good faith exception applied and suppression was not justified).

### 2. *Sixth Amendment Right to Counsel*

Next, Defendant also argues that Schaar's conversations invaded his attorney-client relationship and, therefore, violated the Sixth Amendment right to counsel. But the Sixth Amendment right to counsel does not attach until a defendant is indicted. *Canales v. Stephens*, 765 F.3d 551, 571 (5th Cir. 2014); *see also Massiah v. United States*, 377 U.S. 201, 206, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964). The recordings were made before Defendant was indicted. Therefore, he had no Sixth Amendment right to counsel when they were made. Defendant admits as much in briefing. *See* Memorandum Brief [101] at 5-6. But he claims that controlling precedents are "not consistent with the original public understanding" of the Sixth Amendment and urges the Court to "reconsider" the issue. *Id.* at 6. This Court does not have the authority to

---

351, 358 (5th Cir. 2014) (declining to exclude evidence obtained in alleged violation of the Stored Communications Act); *Rios-Arias v. Sessions*, 684 F. App'x 441 (5th Cir. 2017) (declining to apply exclusionary rule where agents allegedly violated certain federal regulations).

reconsider decisions of the Supreme Court or Court of Appeals.

Regardless, Defendant misrepresented the factual record on this issue. In briefing, Defendant stated that "Schaar repeatedly ask[ed him] about what his attorneys have told him and what he has told his attorneys." Memorandum Brief [101] at 4. The sections of transcript cited by Defendant do not match this description.

First, Schaar asked Defendant if he had "talked to [his] attorney," but he did not ask him to reveal any communications. Exhibit G-1A at 5. Within the context of the conversation, Schaar was asking if Defendant had heard any news about the investigation into their scheme – a reasonable and obvious question from a coconspirator. Schaar later repeated the question because they were interrupted by a phone call and had moved on to different topics of conversation. *Id.* at 5, 11. But within the context of the conversation, Schaar was again playing the role of a concerned coconspirator seeking information about a looming federal investigation.

At the next meeting, Schaar asked Defendant whether he had told his attorney about meeting with Randy Thomley, an owner of the pharmaceutical marketing companies and Hattiesburg tree farm at which many recipients of Defendant's fraudulent prescriptions were employed. Exhibit G-2A at 14. It is obvious from the context of the conversation that Schaar was attempting to elicit an admission from Defendant that he had gone to Hattiesburg to forge patient records with Thomley in an effort to cover his tracks. *Id.*

Even if Schaar's questions constituted prosecutorial attempts to invade Defendant's attorney-client relationship, they were harmless because Defendant did

not reveal any privileged information. "[A]bsent demonstrable prejudice," there is no basis for imposition of a remedy for a prosecutor's alleged violation of the Sixth Amendment right to counsel. *United States v. Morrison*, 449 U.S. 361, 365-66, 101 S. Ct. 665, 66 L. Ed. 2d 564 (1981); *see also United States v. Garcia*, 887 F.3d 205, 209 (5th Cir. 2018) (jury verdict reversed only where prosecutorial misconduct prejudicially affected the defendant's rights); *United States v. Davis*, 226 F.3d 346, 353 (5th Cir. 2000) (even if government intruded on defendant's attorney-client privilege, remedy is not available absent a showing of prejudice).

### 3. *Denial of Evidentiary Hearing*

Finally, Defendant argues that the Court erred by denying his request for an evidentiary hearing on these matters. But Defendant has not identified any material factual dispute warranting an evidentiary hearing. The Government admitted the conduct which Defendant claims violated his rights, and Defendant's Motion to Suppress [31] the resultant recordings presented legal questions, rather than factual disputes. "Evidentiary hearings are not granted as a matter of course; such a hearing is required only if any disputed material facts are necessary to the decision of the motion." *United States v. Dean*, 100 F.3d 19, 21 (5th Cir. 1996); *see also United States v. Fields*, 565 F.3d 290, 298 (5th Cir. 2009); *United States v. Briscoe*, 596 F. App'x 299, 302 (5th Cir. 2015); *United States v. Turner*, 372 F. App'x 455, 456 (5th Cir. 2010). Here, there were no disputed facts, and no evidentiary hearing was necessary.

Additionally, the materials Defendant attached to the current motion do not

demonstrate the existence of any factual dispute. *See* Exhibit A to Rebuttal, *United States v. Diaz*, No. 2:17-CR-31-KS-JCG (S.D. Miss. Apr. 23, 2018), ECF No. 105-1. And Defendant's rather bold declaration in briefing that the Court provided no factual basis for its decision and cited no supporting statute or regulation is demonstrably false. The Court's previous order speaks for itself. *See* Order, *United States v. Diaz*, No. 2:17-CR-31-KS-JCG (S.D. Miss. Feb. 21, 2018), ECF No. 60.

## D. *Sufficiency of the Evidence*

Defendant argues that there was insufficient evidence to support the jury's verdict as to several counts. "A claim that the evidence is insufficient to support a conviction is reviewed in the light most favorable to the verdict, accepting all credibility choices and reasonable inferences made by the jury." *United States v. Wise*, 221 F.3d 140, 147 (5th Cir. 2000). The Court "must uphold the conviction if a rational jury could have found that the government proved the essential elements of the crime charged beyond a reasonable doubt." *Id.* "[T]his review is highly deferential to the verdict," and "a defendant seeking reversal on the basis of insufficient evidence swims upstream." *United States v. Chapman*, 851 F.3d 363, 376 (5th Cir. 2017).

### 1. *Count 1 – Conspiracy to Defraud the Government*

First, Defendant argues that there was insufficient evidence to support a conviction on the charge of conspiracy to commit wire fraud and/or to defraud the government. Specifically, Defendant argues that the Government produced no evidence that he agreed to or intended to participate in such a conspiracy.

First, the elements of wire fraud are: "(1) a scheme to defraud; (2) the use of, or causing the use of, wire communications in furtherance of the scheme; and (3) a specific intent to defraud." *United States v. Kuhrt*, 788 F.3d 403, 413-14 (5th Cir. 2015) (citing 18 U.S.C. § 1343; *United States v. Simpson*, 741 F.3d 539, 547-48 (5th Cir. 2014)). "To prove conspiracy to commit wire fraud, the government must prove that: (1) two or more persons made an agreement to commit wire fraud; (2) the defendant knew the unlawful purpose of the agreement; and (3) the defendant joined in the agreement willfully, *i.e.*, with specific intent." *Id.* at 414 (citing 18 U.S.C. § 1349; *United States v. Grant*, 683 F.3d 639, 643 (5th Cir. 2012)).

"To be guilty of healthcare fraud under 18 U.S.C. § 1347, a defendant must have 'knowingly and willfully executed a scheme to defraud a government health care program like Medicare.'" *United States v. Gevorgyan*, 886 F.3d 450, 455 (5th Cir. 2018) (quoting *United States v. Sanjar*, 876 F.3d 725, 745 (5th Cir. 2017)). And "under 18 U.S.C. § 1349, willfully joining with another to engage in such a scheme, with awareness of the agreement's unlawful purpose, is a conspiracy to commit healthcare fraud." *Id.* (quoting *Sanjar*, 876 F.3d at 745). "Both charges require proof of knowledge and specific intent to defraud." *United States v. Willett*, 751 F.3d 335, 339 (5th Cir. 2014). But the Government need not prove that the Defendant actually submitted the fraudulent documentation, or that he committed any overt act. *United States v. Gibson*, 875 F.3d 179, 186 (5th Cir. 2017). Rather, it must only prove that Defendant "willfully participated in a scheme to defraud with the intent that the scheme's illicit objectives

be achieved . . . , not that he took part in every aspect of that scheme." *United States v. Tencer*, 107 F.3d 1120, 1127 (5th Cir. 1997).

"Direct evidence of a conspiracy is unnecessary; each element may be inferred from circumstantial evidence." *United States v. Willett*, 751 F.3d 335, 339 (5th Cir. 2014). An agreement can be inferred from concert of action. *United States v. Dailey*, 868 F.3d 322, 329 (5th Cir. 2017). "The conspirators may have a silent and informal agreement. Indeed, the voluntary participation may be inferred from a collection of circumstances, and knowledge may be inferred from surrounding circumstances." *Willett*, 751 F.3d at 339. But "there is insufficient evidence of a conspiracy if the Government has only piled inference upon inference upon which to base a conspiracy charge." *Id.*

There was sufficient evidence to support the jury's conclusion that Defendant knowingly participated in a scheme to defraud Tricare with the intent that the scheme's illegal objectives be achieved, and that he conspired to use wire communications to facilitate that scheme. Schaar testified that he asked Defendant to sign prescriptions for compound medications sold by Schaar's employer. Defendant knew that Schaar was compensated for each signed prescription, and Defendant knew that some of the beneficiaries of the prescriptions were covered by Tricare. Defendant also knew that the beneficiaries to receive the prescriptions came from Schaar's employer, rather than a medical provider. There was testimony at trial from both Jason May and Jay Schaar that the contents of the compounded medications on the

pre-printed prescription forms delivered to Defendant by Schaar were selected solely for their profitability. There was also abundant undisputed testimony that the insurance claims for these fraudulent prescriptions were submitted via wire communication, through Express Scripts, to Tricare.

Multiple beneficiaries – LeAnn Hardwick, Jonah McCleary, and Samuel Clinton – testified at trial that they did not want the prescriptions, that they rarely used them, and that Defendant prescribed the medications without examining them. At least two beneficiaries – LeAnn Hardwick and Albert James Hardwick – testified that Defendant traveled to their home to examine them after they had already been receiving the medications for months.

The evidence demonstrated that Defendant authorized the pre-printed and pre-checked prescriptions for Schaar without actually examining the beneficiaries, whether he signed the prescriptions himself, used a signature stamp, or authorized another person in his office to use a signature stamp.[5] Defendant admitted on tape that he had broken the law. He also admitted at trial that, once he learned he was being audited by Tricare, he attempted to cover up the crime by knowingly submitting falsified patient records and audit forms containing false information to Tricare.

Moreover, Defendant has decades of experience in the health care industry. His demeanor and attitude in the recorded conversations with Schaar could fairly be

---

[5]*See Willett*, 751 F.3d at 340-41 (permissible to infer knowledge of conspiracy to commit healthcare fraud where defendant held himself out as owner of business, had a position of authority therein).

described as conspiratorial, insofar as he encouraged Schaar to withhold information from investigators and expressed his intent to feign ignorance on material topics, including the identity of Randy Thomley. He indisputably conspired to obstruct the government's investigation by traveling around Hattiesburg with Thomley collecting information to create falsified patient records. In light of these actions in combination with all the evidence cited above, there is ample evidence to support the jury's verdict on Count 1.

2.      *Count 6 – Conspiracy to Distribute a Controlled Substance*

Next, Defendant argues that there was insufficient evidence to support a conviction on the charge of conspiracy to distribute a controlled substance outside the scope of professional practice and not for a legitimate medical purpose. "The elements of conspiracy to distribute and dispense a controlled substance outside the scope of professional practice are: (1) an agreement by two or more persons to unlawfully distribute or dispense a controlled substance outside the scope of professional practice and without a legitimate medical purpose; (2) the defendant's knowledge of the unlawful purpose of the agreement; and (3) the defendant's willful participation in the agreement." *United States v. Oti*, 872 F.3d 678, 687 (5th Cir. 2017). "An agreement may be inferred from concert of action, knowledge may be inferred from surrounding circumstances, and voluntary participation may be inferred from a collection of circumstances." *Id.*

The evidence cited above is sufficient to support a conviction on conspiracy to dispense the compounded medications in question. It is undisputed that some of the

prescriptions included a pain cream with Ketamine, a Schedule III controlled substance. Schaar testified that Defendant knew the compounds had Ketamine in them and had commented on it. Defendant never examined the beneficiaries, read their medical records, or contacted their personal physicians before prescribing them a controlled substance. The Government's expert, Dr. Stephen Thomas, testified that Defendant's actions were outside the scope of legitimate medical purpose and professional practice. Therefore, there was sufficient evidence to support a conviction on Count 6.

### 3. *Count 11 – Conspiracy to Obstruct Justice*

Defendant argues that there was insufficient evidence to support the jury's verdict on the charge of conspiracy to obstruct justice. The relevant statute provides:

> Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both.

28 U.S.C. § 1519. "To support a conspiracy conviction under 18 U.S.C. § 371, the government must prove three elements: (1) an agreement between two or more people to pursue an unlawful objective; (2) the defendant's knowledge of the unlawful objective and voluntary agreement to join the conspiracy; and (3) an overt act by one or more of the conspirators in furtherance of the conspiracy's objective." *United States v. Fisch*, 851 F.3d 402, 406-07 (5th Cir. 2017). "Direct evidence of a conspiracy is unnecessary; each element may be inferred from circumstantial evidence. An

agreement may be inferred from concert of action, voluntary participation may be inferred from a collection of circumstances, and knowledge may be inferred from surrounding circumstances." *Id.* at 407.

When Tricare's benefit manager, Express Scripts, initiated an audit of Defendant's prescriptions, it notified Defendant of the audit and specifically warned that falsifying records in response to it was a federal crime. It is undisputed that Defendant never examined the relevant beneficiaries before he wrote the prescriptions. Defendant admitted at trial that he falsified patient records to cover up what he had done. He bluntly testified: "I did not have a choice. They asked for records. I did not have records. So I had to make records." Transcript of Jury Trial Vol. IV at 240, *United States v. Diaz*, No. 2:17-CR-31-KS-JCG (S.D. Miss. May 2, 2018), ECF No. 109. On a trip to Hattiesburg with Jay Schaar and Randy Thomley, he briefly examined some patients to create backdated patient records. But Jonah McCleary, one of the relevant beneficiaries, testified that Defendant never examined him, despite Defendant's submission of patient records for McCleary which included vital statistics such as blood pressure.

In summary, Defendant testified that he came to Hattiesburg with the specific purpose of collecting patient information with Jay Schaar and Randy Thomley. He directly testified that he did so to create false, backdated patient records and submit a fraudulent response to the Tricare audit in an attempt to keep himself out of trouble. The evidence at trial was more than sufficient to support the jury's verdict as to Count 11.

*4.    Defendant's Signature*

Finally, Defendant argues that there is no credible evidence that he signed the prescriptions in question, and, therefore, the evidence is insufficient to support convictions on Counts 2, 3, 4, 5, 7, 8, 9, and 10. Jay Schaar testified that Defendant's employees would sometimes use a signature stamp to stamp prescriptions for Defendant, and it is undisputed that some of the original, preprinted signed prescriptions were found at Defendant's office. Schaar also testified that Defendant committed to authorize all the prescriptions Schaar brought him. In fact, Defendant admitted to signing prescriptions that Schaar brought him when he had never examined the patients. This evidence is sufficient to support the jury's conclusion that Defendant either signed, stamped, or authorized someone else to stamp the prescriptions on his behalf. *See Willett*, 751 F.3d at 340-41 (permissible to infer knowledge of conspiracy to commit healthcare fraud where defendant held himself out as owner of business, had a position of authority therein).

**E.    Jury Instructions**

*1.    Deliberate Ignorance*

Defendant contends that there was not sufficient evidence to support a deliberate ignorance instruction. "The deliberate ignorance instruction should be given when a defendant claims a lack of guilty knowledge and the proof at trial supports a reasonable inference of deliberate ignorance." *United States v. Junius*, 739 F.3d 193, 205 (5th Cir. 2013). Therefore, "[s]ubmission of a deliberate ignorance instruction is proper where the evidence shows (1) subjective awareness of a high probability of the

29

existence of illegal conduct, and (2) purposeful contrivance to avoid learning of the illegal conduct." *Id.* "Even if the district court errs in its decision to give the deliberate ignorance instruction, any such error is harmless where substantial knowledge of actual knowledge is presented at trial." *Id.* at 204-05.

In the Court's opinion, all the evidence outlined above is sufficient to support an inference that, at the very least, Defendant was aware of a high probability of illegal conduct, and that he intentionally avoided learning of it. In fact, as the Government's recording demonstrated, he planned to feign ignorance and stonewall the Government's investigation, and he advised Schaar to do the same. Defendant's expressed motivation for authorizing the prescriptions – to help VA patients who could not get medications – does not hold water in light of the fact that he prescribed the same compounds to persons without a military service record, such as Jonah McCleary. His admitted attempt to cover up the conspiracy by falsifying patient records and submitting fraudulent responses to the Tricare audit is also relevant to this issue, as are his decades of experience in the healthcare industry. The deliberate ignorance instruction was justified.

### 2. *Independent Consideration of Each Count*

Next, Defendant argues that the Court should have instructed the jury that they were not required to convict on all conspiracies if they only found Defendant guilty of one. The Court did, in fact, provide such an instruction. Jury Instruction 25, which mirrored Fifth Circuit Pattern Instruction 1.21, provided: "A separate crime is charged in each count of the indictment. Each count, and the evidence pertaining to it, should

be considered separately. The fact that you may find the defendant guilty or not guilty as to one of the crimes should not control your verdict as to any other." Transcript Vol. V [110] at 189-90; Jury Instructions at 40, *United States v. Diaz*, No. 2:17-CR-31-KS-JCG (S.D. Miss. Mar. 15, 2018), ECF No. 91.

###### 3.    *Aiding and Abetting*

Defendant also contends that the Court should not have provided an aiding and abetting instruction because there was no proof that anyone acted under his direction with regard to the conduct described in the indictment. Aiding and abetting is an alternative charge on every count regardless of whether it was listed in the indictment. *United States v. Walker*, 621 F.3d 163, 166 (5th Cir. 1980). To prove aiding and abetting, "the government need only establish that [Defendant] assisted the actual perpetrator of the . . . crimes while sharing the requisite criminal intent." *United States v. Stalnaker*, 571 F.3d 428, 437 (5th Cir. 2009); *see also United States v. Rivera*, 295 F.3d 461, 466 (5th Cir. 2002). In other words, Defendant did not have to participate in or direct every aspect of the conspiracy. It is enough that he knowingly played a key role in the conspiracy and shared the same intent as his coconspirators. All of the evidence discussed above is sufficient to justify an aiding and abetting instruction.

## F.    *Cumulative Error*

Finally, Defendant argues that the Court should apply the cumulative error doctrine.

> The cumulative error doctrine provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and

harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal. The doctrine justifies reversal only in the unusual case in which synergistic or repetitive error violates the defendant's constitutional right to a fair trial. The defendant's allegations of non-error do not play a role in cumulative error analysis since there is nothing to accumulate.

*United States v. Eghobor*, 812 F.3d 352, 361 (5th Cir. 2015) (citations omitted).

According to Defendant, the issues with the jury, the Government recordings of Defendant and Schaar, and the other issues discussed in opinion cumulatively deprived him of a fair trial. However, for the reasons provided above, the Court finds that no error was committed.

### III. MOTION FOR REVOCATION OR AMENDMENT [97]

Defendant argues that the Magistrate Judge erred in denying his Motion for Bail Pending Sentencing [79]. A convicted defendant has no constitutional right to bail. *United States v. Olis*, 450 F.3d 583, 585 (5th Cir. 2006); *United States v. Williams*, 822 F.2d 512, 517 (5th Cir. 1987). Any right a convicted defendant has to bail "derives from 18 U.S.C. § 3143, which establishes a presumption against its being granted." *Olis*, 450 F.3d at 585. The statute provides, in relevant part:

(1) Except as provided in paragraph (2), the judicial office shall order that a person who has been found guilty of an offense and who is awaiting imposition or execution of sentence . . . be detained, unless the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released . . . .

(2) The judicial officer shall order that a person who has been found guilty of an offense . . . and is awaiting imposition or execution of sentence be detained unless –

(A) (i) the judicial officer finds there is a substantial

likelihood that a motion for acquittal or new trial will be granted; or

(ii)    an attorney for the Government has recommended that no sentence of imprisonment be imposed on the person; and

(B)    the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to any other person or the community.

18 U.S.C. § 3143(a).

Therefore, a convicted defendant awaiting sentencing must be detained unless 1) the Court finds by clear and convincing evidence that he is not likely to flee or pose a danger to the safety of any other person or the community if released, and 2) the Court finds there is a substantial likelihood that a motion for acquittal or new trial will be granted. For all the reasons provided herein, the Court denied Defendant's Motion for New Trial [100]. Therefore, there is no substantial likelihood that a motion for acquittal or new trial will be granted, and the Magistrate Judge did not err.

## IV. CONCLUSION

For these reasons, the Court **denies** Defendant's Motion for New Trial [100] and likewise **denies** Defendant's Motion for Revocation or Amendment [97] of the Magistrate Judge's Order [86] denying bond pending sentencing.

SO ORDERED AND ADJUDGED this 5th day of June, 2018.

/s/   Keith Starrett
KEITH STARRETT
UNITED STATES DISTRICT JUDGE